FLEMING, Acting General Superintendent of D. C. Penal Institutions, v. TATE.

No. 9217.

United States Court of Appeals District of Columbia.

Argued June 3, 1946.

Decided June 28, 1946.

Mr. Sidney S. Sachs, Assistant United States Attorney, of Washington, D.C., with whom Mr. Edward M. Curran, United States Attorney, and Mr. A. E. Gottschall, Attorney, Department of Justice, both of

[21] 12 U.S.C.A. § 548.

Washington, D. C., were on the brief, for appellant. Mr. Ray L. Jenkins, Assistant United States Attorney, of Washington, D. C., also entered an appearance for appellant.

Mr. John P. Mullen, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and WILBUR K. MILLER and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

Appellee Tate was convicted in 1927 on charges of housebreaking and larceny. He was sentenced to 40 years' imprisonment. He served 16 years and was paroled in 1943. One of the conditions of the parole was that he not leave the District of Columbia without written approval of the local Board of Indeterminate Sentence and Parole. Two years later the Board was informed that he had left the District; a warrant was issued for his arrest; he was taken before the Board, was returned to prison for violation of his parole, and began serving his unexpired sentence of 24 years.

When Tate was arrested, counsel who had theretofore represented him applied for leave to appear in his behalf at the hearing, and Tate's employer requested permission to testify. These requests were denied because the Board does not permit counsel or witnesses to appear at these hearings. Tate petitioned for a writ of habeas corpus. The District Court held a hearing upon the petition and the return thereto. The able justice who heard the matter wrote a careful opinion and issued the writ, without prejudice to subsequent proceedings for the revocation of the parole in conformity with the statute. This appeal followed.

We agree with the opinion and judgment of the District Court.

■ The question is one of statutory construction. No constitutional right is involved, as parole is a matter of grace.[1] The statute[2] requires that after a paroled prisoner is arrested for violation of his parole, he "shall be given an opportunity to appear before said Board". The District Court held that this provision means an effective appearance, and thus necessarily means the presence of counsel if the prisoner so elects, and the receipt of testimony if he has testimony to present.

■ The limits of this decision must be carefully and emphatically stated. Appellant urges that the presence of counsel would convert the hearing into a legal battle; that the reasoning of the court would apply also to applications for parole; that the hearings would be prolonged; that it would follow that if the prisoner had no counsel an attorney would have to be assigned him; that the rules of evidence would be invoked; that the presence of a prosecutor would be necessary; and that "Without doubt there are other procedural problems, presently unforeseen, which would rear their heads to plague the parole system." Not one of these results is to be understood as following from our holding in this case. The same situation does not exist in applications for parole. The presence of counsel does not mean that he may take over control of the proceeding. The receipt of testimony offered by the prisoner need not be governed by the strict rules of evidence, any more than the application of those rules is necessary in many informal administrative hearings. The presence of counsel and the receipt of testimony offered by the prisoner need not prolong the hearing beyond the time necessary in any event for the Board to ascertain the facts upon which it is about to act. It is not necessary that counsel be assigned, as the requirement here is not jurisdictional.[3] The statute requires an "opportunity" to appear, no more. The participation by counsel in a proceeding such as this need be no greater than is necessary to insure, to the Board as well as to the parolee, that the Board is accurately informed from the parolee's standpoint before it acts, and the permitted presentation of testimony by the parolee need be no greater than is neces-

1 Anderson v. Corall, 1923, 263 U.S. 193, 44 S.Ct. 43, 68 L.Ed. 247; Story v. Rives, 1938, 68 App.D.C. 325, 97 F.2d 182.

2 D.C.Code (1940) § 24—206.

3 Cf. Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A. L.R. 357.

sary for the same purpose. But we believe that these minima are essential to a valid appearance before the Board as required by the statute.

Not the slightest relaxation of supervisory control over parolees need result. The presence of counsel is meant as a measure of protection to the prisoner; it should not be permitted to become a measure of embarrassment to the tribunal. The receipt of testimony offered by the prisoner is one of the fundamentals of fair play, so frequently asserted by the courts. These two features, the presence of counsel and the receipt of evidence, are the basic characteristics of our whole system of administration of justice. To say that they cause the degradation of a proceeding into an uncontrolled melee is to deny fundamentals.

In a proceeding for revocation of a parole in a case such as that at bar, the prisoner is accused of a specific act which, if committed, is violative of the terms of his parole. Therein lies the vast difference between this hearing and a hearing upon an application for parole. It is urged by appellant that the situation is not different from the infraction of prison rules by an incarcerated prisoner. The difference is that Congress has made no requirement respecting the incarcerated one, but it has made a requirement as to an accused parolee.

What did Congress have in mind when it said that when so accused the parolee "shall be given an opportunity to appear before said Board"? It could not have meant merely his physical presence. Such a statutory requirement must have had a purpose. The only conceivable purpose is that the parolee should be enabled to present whatever he may have to present pertinent to the question raised by his alleged act. Obviously, the Board is to ascertain the facts, and decide what effect should be given them. Its discretion in continuing or revoking parole is uncontrolled, but clearly this statutory provision means that it cannot act in disregard of the facts or refuse to hear argument.

The record of the hearing before the Board, which was lodged with this court, shows that Tate claimed that he "got per-

mission from Mr. Bradshaw to go to Virginia" and that he then went there for the funeral of his sister. He denied that he had left Washington at any other time. "Mr. Bradshaw" is not identified in the record but seems to have been Tate's parole-sponsor and the person who asked permission to testify at the hearing. When Congress provided that the parolee must be given an opportunity to appear before the Board, what else could it have meant other than that he be afforded an opportunity to show facts such as those? Tate was told at the hearing that Mr. Bradshaw had had no authority to give permissions, and was asked whether "Mr. Keeney" ever gave him permission. Apparently Mr. Keeney had authority, but he must have been an employee, not a member, of the Board. The Board revoked the parole "Because of the failure of the parolee to obtain permission of the Board to leave his parole limits". This language of the order indicates that the revocation rested upon the failure to get permission from the proper party, rather than failure to get it in writing as the parole itself required.

The parole system is an enlightened effort on the part of society to rehabilitate convicted criminals. Certainly no circumstance could further that purpose to a greater extent than a firm belief on the part of such offenders in the impartial, unhurried, objective, and thorough processes of the machinery of the law. And hardly any circumstance could with greater effect impede progress toward the desired end than a belief on their part that the machinery of the law is arbitrary, technical, too busy, or impervious to facts. The crisis in the rehabilitation of these men may very well be the treatment which they receive when accused of an act violative of the terms of what must be to them a precious privilege. It is true that certainty of penalty for guilt is one of the chief elements in successful law enforcement, but of equal importance in that success is an undeviating, dispassionate adherence to facts as wholly controlling. Congress must have had this in mind when it required that a parolee thus accused must have an opportunity to appear before the Board.

We are impressed by the reasons given by the authors of the Attorney General's Survey of Release Procedures (1939) Vol. IV, pp. 246, 247, for affording hearings to parolees accused of parole violation.[4] But we are equally, and unfavorably, impressed with their comment (p. 246) that "In practically every instance, the hearing on a parole violation is merely a formality to permit the returned violator to give his version of the events which led up to the revocation of his parole. As far as the parole authorities are concerned, the facts justifying the revocation of the parole almost invariably are clearly established before the time of (or concurrent with) the return of the offender to the institution." And the same Survey (pp. 247, 248) points out[5] that the reasoning which denies a parolee the right to legal representation would also deny him any vested right to a formal hearing. By the same token, a statute giving him a right to a hearing would seem to carry with it the right to representation.

We are fully conscious of the fact that we are dealing with a much-discussed subject and that the federal authorities under an identical statute have since 1910 refused to permit counsel to appear or testimony to be offered at such hearings. But no judicial authority upon the point has been brought to our attention, and we have found none. The long administrative practice would be compelling upon us if we did not consider the statute plain and the issue vitally important.

█ We do not repeat but adopt with approval the reasoning which led the District Court to grant the writ.

Affirmed

---

[4] "A question naturally arises as to the advisability of holding these hearings which consume the time of men already overburdened with work. The answer to this objection is threefold: In the first place, the possibility exists that the parole agent was overhasty in his action in returning the parolee as a violator. Parole agents are human, and it is possible that friction between the agent and parolee may have influenced the agent's judgment. In fairness to the violator, this is a possibility which should be investigated by some higher authority. The hearing is of special importance in those States in which the sponsorship system of supervision exists, since there have been numerous instances in which sponsor-employers 'sweated' the parolees in their custody unmercifully under threat of declaring them parole violators on trumped up charges.

"Another reason for holding a hearing is that often the true psychology of the parolee precedent to the commission of the violation is revealed. The trend of the parolee's thought in trying to rationalize his behavior may afford clues to his mental and emotional make-up which will be useful in effecting his future adjustment in society.

"Third, the hearing is an opportunity for the violator to discuss his behavior and to have it analyzed by men who, by virtue of the positions they occupy, necessarily have an interest in his future behavior. If, through his own statements, a parole violator can be made to see how irrationally he has acted, and how twisted his thinking has been; if, as often is the case, he can be led to see himself as ridiculous or foolish by his own statements, a long step toward his ultimate rehabilitation may have been taken."

[5] "It sometimes is argued that a parolee is entitled to legal representation at hearings on parole violations, but as the legal status of a parolee is exactly the same as though he were still incarcerated, the prevailing opinion is that his return to prison is an administrative prerogative of the authorities and that he has no legal grounds upon which to base his protest against such a return. By the same reasoning, if his return is effected through the properly authorized channels, he has no vested right to a formal hearing on the matter of his violation."